*FOR PUBLICATION*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

In re

                              Case No. 10-36282

Donna M. Fraleigh,                      Chapter 7

        Debtor.


-----------------------------------------------------X

Brian Fraleigh,

        Plaintiff,                    Adv. P. No. 10-09091

    -against-

Donna M. Fraleigh,

        Defendant.

-----------------------------------------------------X

### MEMORANDUM DECISION DENYING OBJECTION TO DISCHARGE

### A P P E A R A N C E S :

Andrea B. Malin
Genova & Malin, Attorneys
The Hampton Center
1136 Route 9
Wappingers Falls, NY 12590

Thomas W. Bauer
Thomas W. Bauer Esq.
42 Catharine Street
Poughkeepsie, NY 12601

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

## <u>Introduction</u>

Plaintiff objects to the Defendant's discharge on the grounds that she knowingly and fraudulently made a false oath or account, by failing to disclose her live-in boyfriend's presence as a household member and his alleged contribution to the support of herself and her dependents on the means test and schedules. The Court conducted a trial, and denies the objection to discharge, because the live-in boyfriend did not make a material contribution to the Debtor's support, and even if he did, the couple's attitude toward their financial relationship was such that it cannot be said that the Debtor had intent to defraud when she approved and filed her schedules and means test without disclosing the boyfriend or his alleged contribution. The couple viewed themselves as splitting household expenses and having no responsibility with respect to each other's non-household expenses, the antithesis of a relationship of financial support. Finally, the Court finds that the Debtor was forthright with her counsel at the time the schedules and means test were prepared, and she relied on his advice and representation. For all these reasons, the Plaintiff has failed to prove the elements required for denial of discharge under 11 U.S.C. § 727(a)(4)(A). The objection to discharge is DENIED and this complaint is DISMISSED.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a),

28 U.S.C. § 157(a) and the Amended Standing Order of Reference signed by Chief

Judge Loretta A. Preska dated January 31, 2012.  This is a "core proceeding" under

28 U.S.C. § 157(b)(2)(J) (objections to discharge).

## Background[1]

Plaintiff and Defendant are divorced. In 2004, the Defendant began dating

Christopher Sekul ("Sekul"). Trial Tr., 13, 137-38, Apr. 11, 2012 (hereafter, cited

as "Tr."). In 2006, the Defendant moved into Sekul's home with her twin

daughters; the couple rented a home together that year while Sekul's home was

rebuilt after a fire. Tr. at 13. The Defendant resided with Sekul in his home with

her daughters from 2008 until the time her bankruptcy case was commenced,

including during the six-month pre-petition period that is used to prepare a debtor's

schedules and means test.[2] *See* Tr. at 143-45. During the six months prior to the

Defendant's bankruptcy case, the parties' twin daughters were minors, resided with

---

[1] Unless otherwise noted, the following discussion constitutes the Court's findings of facts and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

[2] The Court and the parties stated throughout the trial that the relevant period was October 2009 "to" April 2010. The Defendant commenced her bankruptcy case on April 30, 2010. A debtor's income and expenses of the month of filing are not considered in the calculation of income for purposes of the means test. *See* 11 U.S.C. § 101(10A)(i) (defining "current monthly income" as the average monthly income from all sources that the debtor receives during the 6-month period ending on the last day of the calendar month immediately preceding the date of the commencement of the case). The evidence on which the Court rests its decision is from October 2009 through March 2010.

the Defendant, and Defendant received child support from the Plaintiff. While the precise details were not established at trial, it has been alleged in this adversary proceeding that at some point, Plaintiff's child support obligation was reduced from $215 per week to about $66 per week. *Compare Answer to Complaint*, 4, ¶ 35 *with Defendant's Trial Exhibit A* (indicating child support payments of $66.49).

Defendant commenced her bankruptcy case on April 30, 2010. On Schedule I, a statement of her current income, the only income listed was what the Defendant received from her employment and the child support she received from Plaintiff. Case No. 10-36282, ECF No. 1. An expense for "electricity and heating fuel" of $225 was listed on Schedule J, a statement of current expenditures, as well as $150 for DirecTV and $35.70 for garbage pickup, among other expenses. *Id.* Sekul was listed as a codebtor with respect to creditor "Hudson Valley Federal;" the address provided for Sekul was different from the Defendant's home address. *Id.* On Official Form 22A, commonly referred to as the "means test" established by 11 U.S.C. § 707(b), Debtor listed only her wages and the child support as income, despite a section being provided on the form for "income from all other sources." ECF No. 2, 2. She listed a "household size" of three. *Id.*, 3. Under this information and the corresponding calculations, the "presumption of abuse" did not arise, suggesting that the Debtor could receive the chapter 7 discharge.

On July 1, 2010, Plaintiff, by counsel, filed motions for examination of Defendant and Sekul pursuant to Federal Rule of Bankruptcy Procedure 2004, and to extend the deadline to object to Defendant's discharge under Bankruptcy Code §§ 523 and 727. ECF Nos. 10, 11, 12. The motions were granted by orders entered July 22, 2010, and July 30, 2010. ECF Nos. 17, 19. Other orders and stipulations subsequently were entered with respect to the scheduling of the Rule 2004 exams and the deadlines to object to discharge. Additionally, the chapter 7 trustee and United States Trustee's deadlines to object to discharge were extended; with respect to these entities, the deadline has passed without the filing of a complaint.

The present adversary proceeding was commenced on October 29, 2010. Adv. P. No. 10-09091, 1. The Court granted the Defendant's motion for summary judgment by order entered on August 18, 2011, for the reasons stated in a decision entered on August 16, 2011, on all counts except for denial of discharge for making a false oath. See ECF Nos. 45, 46. The Court found that there was a triable question of material fact concerning whether the Defendant intentionally misrepresented her household size as three instead of four, which would include Sekul, on the means test, and omitted his alleged contribution to the support of her and her daughters on the means test and Schedule I. *See* ECF No. 45. Specifically, the Court stated, "The plaintiff has raised a triable question of material fact with respect to the amount of money, if any, that Sekul contributed to the support of the

debtor and her defendants for purposes of the means test calculation. It may be that the defendant should have disclosed Sekul as a member of the household, because evidence has been offered that suggests that Sekul and defendant function as an economic unit." *Id.* at 26.

Upon request of the Defendant, the Court issued a pretrial ruling from the bench on March 5, 2012, finding upon the uncontroverted allegations presented in the motion for summary judgment that the Defendant and Sekul function as an "economic unit" for purposes of establishing household size on the means test. The "economic unit" test was articulated in *In re Morrison*, 443 B.R. 378, 386 (Bankr. M.D.N.C. 2011), on a motion to dismiss pursuant to section 707(b): "whether the individuals in the house are acting as a single economic unit. Thus, a household will include individuals who are financially dependent on a debtor, individuals who financially support a debtor, and individuals whose income or expenses are inter-mingled or interdependent with a debtor." The *Morrison* court identified seven factors for consideration in applying the economic unit test:

> 1) the degree of financial support provided to the individual by the
>
> debtor; 2) the degree of financial support provided to the debtor by the
>
> individual; 3) the extent to which the individual and the debtor share
>
> income and expenses; 4) the extent to which there is joint ownership
>
> of property; 5) the extent to which there are joint liabilities; 6) the

extent to which assets owned by the debtor or the individual are

shared, regardless of title; and 7) any other type of financial

intermingling or interdependency between the debtor and the

individual.

*Id.* at 388. *Compare In re Epperson*, 409 B.R. 503, 507-508 (Bankr. D. Ariz. 2009)

(denying United States Trustee's motion to dismiss for failure to include all of

roommate's income; finding household was of two and only part of roommate's

income paid to debtor was necessary for means test, noting "The household

expenses of the Debtor, such as rent, food, and utilities, include the Roommate's

expenses. The Roommate's $900 contributions benefit the Debtor by decreasing

the household expenses the Debtor would otherwise have to pay").

     In the alternative, some bankruptcy courts define household size using

definitions and guidelines of the Internal Revenue Service or the Census Bureau.

The "Internal Revenue dependency approach" relies on the Internal Revenue

Manual, which states that the number of household members allowed for purposes

of determining the applicable National Standards should generally be the same as

those allowed as dependents on the taxpayer's tax returns. *See In re Jewell*, 3655

B.R. 796, 800-801 (Bankr. S.D. Ohio 2007) (rejecting the IRS approach advocated

by the UST; "[the narrow definition] fails to recognize those instances when a

debtor may be actually providing support for a household member, but the

circumstances do not fall neatly within the parameters envisioned by the [United States Trustee]"). A court might determine household size using the Census Bureau's definition, as that entity's definition of "median family income" is referenced in the Bankruptcy Code's definition of "median family income"—though not in a definition of household, which is not defined in the Bankruptcy Code. *Cf.* 11. U.S.C. § 101(39A)(A) (defining "median family income"). "The Census Bureau defines 'household' as 'all of the people, related and unrelated, who occupy a housing unit.'" *In re Ellringer*, 370 B.R. 905 (Bankr. D. Minn. 2007) (citation omitted). The *Ellringer* court held that the Census Bureau definition of household should apply: "The Census Bureau provides the most appropriate definition of 'household' for use in the means test because it ensures that a household in the means test will have the same number of members as the calculation of median family income." *Id.* at 910-911. The flaws with the IRS and Census standards are neatly summarized by the court in *In re Herbert*:

> While this court agrees with the *Ellringer* court to the extent it
> recognizes that there will be instances in which unrelated, non-
> dependent individuals should be treated as part of a household, the
> "heads on bed" approach adopted by that court is too broad because it
> includes anybody who may be residing under the debtor's roof without
> regard to their financial contributions to the household or the

monetary support they may be receiving from the debtor. Neither does

it take into consideration their dependency or relationship to the

debtor. On the other hand, the court declines to adopt the standards of

the Internal Revenue Manual for purposes of determining household

size because they do not account for the situation in which a debtor

may be supporting an individual without declaring that person as a

dependent on his tax return.

*In re Herbert*, 405 B.R. 165, 169 (Bankr. W.D.N.C. 2008).

On March 5, 2012, the Court ruled that the economic unit standard is the

appropriate measure of household size in the case at bar. Arguably, the Court had

already ruled in the decision on the motion for summary judgment that this is the

standard under which the means test should have been calculated. Further, several

of the factors articulated by the *Morrison* court are present in the circumstances at

bar and were uncontroverted on the motion for summary judgment: the Defendant

and Sekul allegedly shared expenses such as the mortgage payment; the couple

shared a home; Sekul allowed the Defendant use of his boat; Defendant co-signed

Sekul's loan for the boat; Debtor had loaned Sekul $43,000, which was repaid; and

Defendant co-signed a second loan of $25,000 from the credit union. *See* ECF Nos.

38, 41, 45.

The Court applied the economic unit test to the determination of household size; the amount of Sekul's actual contribution to the support of the Defendant was left to be established at trial. The amount of Sekul's support goes to whether the means test and schedules were false, and if so, whether such falsity was material. Further, as the present cause of action is for denial of discharge under Bankruptcy Code § 727(a)(4)—as opposed to the less severe penalty of dismissal under § 707(b), which does not require intent to defraud—the Court required Plaintiff to present evidence of knowledge of the falsity and fraudulent intent. The Court emphasized that the issue to be tried was not whether the Debtor filled out the means test and schedules properly, but was whether the Debtor intentionally mislead creditors and the Court by omitting Sekul's presence in her financial life from the filings.

The Court ruled that only the amount of Sekul's income that goes to the support of the Debtor should be included in the Debtor's current monthly income. *See Rice v. Sasse (In re Sasse)*, 438 B.R. at 643 ("[Plaintiff] wants the debtor to include all of his girlfriend's income as part of his current monthly income, but ignore the reality that she is part of the resulting 'household.' It is as if the plaintiff suggests that she is little more than a phantom, existing only to supply the debtor with additional income but never actually resting her head in a physical location."); *Epperson*, 409 B.R. at 508 ("the Code explicitly limits a third-party's contribution

to current monthly income to that amount the third-party pays toward the household expenses of the debtor.") (citing 11 U.S.C. § 101(10A)(b)); *In re Ellringer*, 370 B.R. 905, 91 (Bankr. D. Minn. 2007) (noting that the roommate was not a dependent of the debtor, and stating, "the statute only requires that the debtor include income provided by a person other than the debtor for support of the debtor or the debtor's dependents.").

It appears that the question of how much of a third party's income should be factored into the debtor's "current monthly income" and disclosed on Schedule I is a matter of first impression for a court applying the "economic unit" approach to household size. The reasoning underlying *Sasse*, *Epperson* and *Ellringer* applies with equal force when the question is in the context of an "economic unit." The nonfiling unit-member presumably has his or her own expenses. Bankruptcy Code § 101(10A)(B) plainly limits third-party income, when computing "current monthly income," to amounts paid "on a regular basis for the household expense of the debtor or the debtor's dependents …" 11 U.S.C. § 101(10A)(B) (emphasis added). Further, the purpose of disclosures is to ease the burden on trustees and to yield assets that can be liquidated for the benefit of creditors, *see Bernhardt v. Radloff (In re Radloff)*, 418 B.R. 316, 322 (Bankr. D. Minn. 2009), and the purpose of the means test is to be sure that a debtor who can afford to repay debts does not "abuse" the Bankruptcy Code by filing a chapter 7 case. *See In re Gilligan*, No. 06-

00885-5-ATS, 2007 WL 6370887, at *1 (Bankr. E.D.N.C. Jan. 24, 2007)

("According to § 707(b)(2), if a debtor's means test shows an ability to repay some

portion of his debts, then there is a presumption of abuse, and, absent special

circumstances, the case must either be converted to chapter 13 or dismissed.").

Similarly, for purposes of section 727(a)(4), a false oath is material "simply if it is

pertinent to the discovery of assets, and a 'material' matter is one bearing a

relationship to the debtor's business, transactions or estate which might lead to the

discovery of assets, business dealings, or the existence or disposition of the

debtor's property." *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 568 (Bankr.

S.D.N.Y. 2005); *In re Curcio*, 387 B.R. 278 (Bankr. N.D. Fla. 2008) ("even if a

portion of the proceeds [of a sale of real property] would qualify as 'income,' the

Debtor could not have 'received' any proceeds because she held no equitable

interest in the property."). Requiring a nonfiling third party to disclose all income

regardless of a debtor's interest in such property, even in the context of an

"economic unit," would confuse these goals and yield no benefit to the estate.

   Further, the factors a court may consider in determining whether the debtor

and thirty party function as an economic unit are not all concerned with the support

of the debtor.  The court considers, among other things, the financial support the

debtor provides the other party, whether there are joint liabilities, and whether

assets are shared regardless of title. The "economic unit" test considers the debtor's

overall financial picture and applies only to determine household size. Where, as here, the debtor operates in an economic unit with a third party but the third-party's financial contribution to the Debtor's support is inconsequential, requiring disclosure of all the third-party's income as an automatic application of the "economic unit" test would distort the debtor's assets and ability to repay debt.

### *Evidence presented at trial*

The Court required an evidentiary hearing to determine whether the Defendant's alleged failure to include the contribution of her live-in boyfriend, Sekul, to the support of herself and her two dependent children constitutes a false oath in connection with the bankruptcy case, for purposes of whether the discharge should be denied pursuant to 11 U.S.C. § 727(a)(4). The issue is whether the Defendant's failure to disclose Sekul as a member of the household and his alleged contribution to Defendant's support on the schedules and means test is a material misrepresentation that warrants denial of discharge.[3]

The Court heard testimony from Sekul, his friend Corey Madison, the Defendant, and Brian Juran, the attorney who prepared and filed the Debtor's bankruptcy petition and schedules. The testimony of Madison was largely irrelevant, and the Court found that he lacked credibility as a witness. *See* Tr. at

---

[3] Despite having stipulated to this legal issue in the joint pretrial order, Plaintiff incorrectly argues in his post-trial brief that the case is one of "abuse" that must be dismissed under Bankruptcy Code § 707(b). Plaintiff failed to include a cause of action for dismissal under § 707(b) in the complaint—assuming he would have had standing to do so. *See* 11 U.S.C. § 707(b)(6). The Court declines to consider such relief at this stage in the litigation.

130 ("The credibility here is shot. But … he's not testifying to anything."). Juran

did not remember the Defendant specifically, and his testimony is largely

unhelpful to the Court, other than his testimony that his practice is to require

several months of bank statements and other financial information from his clients

before filing their bankruptcy cases. *E.g.*, Tr. at 350 ("I'm sure I had bank

statements. You know, my normal thing is I give them a list. So I have things like

bank statements, the title to the car, things of that nature."). The Court denied

admission of evidence and testimony concerning Sekul's landscaping business, as

only the amount of Sekul's support of the Debtor was in issue, as opposed to

Sekul's total income. Tr. at 64-69; 99-119. The Court admitted Defendant's

Exhibits A (bank statements from Hudson Valley Federal Credit Union); B

(checks); C (cash advance from credit card) into evidence. Consistent with its

ruling on the "economic unit" test, the Court emphasized throughout the trial that

the issue was narrow, concerning Sekul's contribution to the Defendant's support.

*E.g.*, Tr. at 38 ("It doesn't make any difference where the money went. He's not

the one in bankruptcy. He's not a married partner. All we have to know is what he

gave to her."). The Court denied admission of a statement of financial support filed

in a proceeding before another tribunal in connection with child support, because

the statement concerned a period several months after the bankruptcy case was

commenced, and was irrelevant to whether Sekul supported the Debtor and her

dependents in the six months prior to filing. Tr. at 46.

### *Denial of Discharge under § 727(a)(4) (false oaths to Court)*

Denial of discharge is a harsh and drastic penalty. *See Korte v. U.S. (In re*

*Korte)*, 262 B.R. 464, 473 (B.A.P. 8th Cir. 2001). The provisions of section 727 are

strictly construed in favor of the debtor. *Id.* (citation omitted).

"The court shall grant the debtor a discharge, unless . . . (4) the debtor

knowingly and fraudulently, in or in connection with the case . . . made a false oath

or account . . . ." 11 U.S.C. § 727(a)(4)(A). To prove an objection to discharge

under section 727(a)(4)(A), the party objecting to discharge must establish by a

preponderance of the evidence that: (1) the debtor made a statement under oath; (2)

the statement was false; (3) the debtor knew that the statement was false; (4) the

debtor made the statement with intent to deceive; and (5) the statement related

materially to the bankruptcy case. *Baron v. Klutchko (In re Klutchko)*, 338 B.R.

554, 567 (Bankr. S.D.N.Y. 2005).

Statements made on the means test and schedules are made "under oath" for

purposes of section 727(a)(4). *See Bernhardt v. Radloff (In re Radloff)*, 418 B.R.

316 (Bankr. D. Minn. 2009).

"[T]he question is whether the debtor intended to deceive any recipient or

reader of the debtor's statements and schedules." *Id.* at 322 (citation omitted). The

questions of Defendant's knowledge of the falsity and intent to deceive are questions of fact. *Id.* "Two factors go to a debtor's state of mind under the 'knowledge' element of the statute's scienter requirement. The first is the debtor's awareness of his own interest in, or claim to, an asset material to the bankruptcy process, or his actual knowledge of the occurrence of a past event or condition in his financial history that is to be disclosed. The second is the debtor's understanding that he was required to disclose the specific points of information on his statements and schedules." *Id.* "As to the fraud element, the inquiry is whether the Debtor intended to induce the reader or recipient of the statements and schedules, to a particular course of action or forbearance, via reliance on the omission or misrepresentation in the document's entries." *Id.* at 322-323. "Fraudulent intent must be shown by actual, not constructive fraud, although a 'reckless indifference to the truth' also suffices." *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005) (citation omitted).

With respect to the burden of proof, the creditor must prove the elements of the claim by a preponderance of the evidence. *Klutchko*, 338 B.R. at 567.

Although the objector to a debtor's discharge bears the ultimate burden of proof, by a preponderance of the evidence, the objector may present a sufficient prima facie case on certain aspects of the question to place the burden on the debtor to come forward with contrary

evidence. The rule leaves to the courts the formulation of rules

governing the shift of the burden of going forward with the evidence

in the light of considerations such as the difficulty of proving the

nonexistence of fact and of establishing a fact as to which the

evidence is likely to be more accessible to the debtor than to the

objector. In litigation under section 727(a)(4)(A), where it reasonably

appears that the oath is false, the burden falls upon the debtor to come

forward with evidence to prove that it was not an intentional

misrepresentation. If the debtor fails to provide such evidence or a

credible explanation for his failure to do so, a court may infer

fraudulent intent.

*Klutchko*, 338 B.R. at 567 (citations omitted); *see also* Fed. R. Bankr. P. 4005 ("At

the trial on a complaint objecting to a discharge, the plaintiff has the burden of

proving the objection").

"To merit denial of discharge under § 727(a)(4), a debtor's

misrepresentation or omission must be material; that is, it must bear a relationship

to the debtor's business transactions or estate, or concern the discovery of assets,

business dealings, or the existence and disposition of the debtor's property." *In re*

*Radloff*, 418 B.R. 316, 322 (Bankr. D. Minn. 2009) (citation omitted). Materiality

will not turn on the value of the nondisclosed asset, or upon whether it is exempt.
*See id.*

*In re Radloff* is useful for the proposition that mistakes in the schedules will
not doom a debtor's discharge. The *Radloff* court stated, "[t]he application of §
727(a)(4) does not require the draconian, zero-tolerance execution of a technical-
compliance fiat." *Radloff*, 418 B.R. at 326. In *Radloff*, a creditor requested denial
of discharge pursuant to section 727(a)(4), on the grounds that he had totally failed
to include any income from his non-filing spouse on Schedule I, among other
reasons. The court allowed the discharge, stating, "The Debtor had relied on his
attorney to see that [schedule I's] disclosures complied with legal requirements."
The court acknowledged that the objecting creditor "had a point," and was
"puzzled" that debtor's counsel had missed the instruction to include income from
a nonfiling spouse over many years of practice. The court ultimately denied the
objection to discharge, as the nonfiling spouse's income was included on the
means test, and debtor's reliance on counsel was not unreasonable. *See id.* at 327;
*accord In re Sasse*, 438 B.R. 631, 633-644 (Bankr. W.D. Wis. 2010) ("The debtor
relied upon his attorney to prepare the means test form, and the decision to claim
only a single member household did not materially misrepresent the debtor's
financial situation."). The *Radloff* court concluded by summarizing the effect of the
creditor's failure to carry her burden of proof: "her anger alone could not suffice;

and even her minute analysis of the inconsistencies and holes in the Debtor's court filings was not enough to make out a case for the drastic expedient of § 727(a)(4)." *Radloff*, 418 B.R. at 332.

*In re Sasse* instructs that failure to include a live-in partner's contribution is not grounds for denial of discharge, when that partner is not included in the household. In *Sasse*, an attorney who represented the debtor in matters unrelated to the bankruptcy objected to the debtor's failure to include his live-in girlfriend's contribution to household expenses. The creditor sought dismissal of the case, or denial or revocation of the discharge. On his means test, the debtor indicated that his was a household of one, and that he was below the state median income. The complainant argued that the case should be dismissed because debtor failed to rebut the presumption of abuse if the girlfriend's income were included, or that the discharge should be denied because the debtor "fraudulently" prepared the means test form.

The bankruptcy court considered whether the discharge should be denied pursuant to 11 U.S.C. § 727(d), the statute that governs revocation of discharge. The bankruptcy court construed 11 U.S.C. § 101(10A)(B) to require the inclusion of third-party income when determining debtor's "current monthly income," but only the amount of such third-party income to the extent that it is used to support the debtor or the debtor's dependents should be included. *Sasse*, 438 B.R. at 641.

The bankruptcy court noted, "the plaintiff cannot demonstrate why amending the means test to include the girlfriend's income would not result in a corresponding increase in the household size." *Id.* The court concluded that the means test had not been fraudulently prepared:

> [T]here may be instances in which another household member makes sufficient contributions to the debtor's current monthly income such that the debtor simply cannot claim a smaller household size or exclude the totality of that person's income. The burden is on the creditor, however, to prove that the contributions are so substantial as to alter the equation. … [h]ere, even accepting the plaintiff's allegations at face value—i.e., even assuming for sake of argument that every penny of the girlfriend's income could be imputed to the debtor—the debtor's household size would justifiably increase and the debtor would still be below median income. ***The debtor relied upon his attorney to prepare the means test form, and the decision to claim only a single member household did not materially misrepresent the debtor's financial situation.***

*Id.* at 643-644 (emphasis added).

With these principles in mind, the Court rules that the Defendant should receive the chapter 7 discharge, as the required knowledge and intent to defraud have not been established by a preponderance of the evidence.

*(1) the Defendant made a statement under oath, and (2) the statement was false.*

In the matter at bar, the first two factors for denial of discharge under § 727(a)(4)(A) have been met: Debtor made a statement under oath, by signing and filing the means test and schedules; and, as the Court has previously ruled that the Debtor and Sekul operated as an economic unit, these statements were false as they omit Sekul's presence as a member of the household and do not reflect the couple's agreement to share household expenses. On the means test, the household size and corresponding standards for expenses correspond to a family of three, not four. Schedule J list electricity and heating fuel expenses of $225, even though the electric bill was paid by Sekul. Tr. at 28; *but see* 76 (Sekul testifying that whoever had the money at the time the fuel bill came would pay it). Defendant testified that most of the stated expenses were overstated, compared with the evidence of the bank statements as presented at trial. Tr. at 327-33. The Court does not undertake an audit of the Defendant's financials to determine what her expenses actually were, because the Plaintiff has failed to meet its burden to prove that the Debtor acted with knowledge and intent to defraud.

_(3) The Defendant did not know that the statement was false; and (4) the_

_Defendant did not make the statement with intent to deceive._

The third and fourth elements for denial of discharge have not been established. As demonstrated by the briefs filed concerning the Court's "pretrial ruling" of March 5, 2012, the household size of the Debtor was actually within a measure accepted by other courts, the "IRS approach." Given that the measure of household size used by Defendant in this case satisfied a legal standard, albeit not the more appropriate one, the Debtor's knowledge of a false statement with respect to the household size has not been established. How to measure household size is a controversial and unsettled question, and Defendant's initial household size of three might be accepted by other bankruptcy courts.

In light of the evidence presented at trial, it cannot be said that Defendant concealed her arrangement and relationship with Sekul with intent to defraud, because the Court finds as a fact that Defendant and Sekul's intent was that they not financially support each other at all. The Defendant's subjective impression of her financial relationship was that she and Sekul would equally share the expenses directly associated with the house—mortgage, electricity, garbage—by offsetting bills, and Defendant would be solely responsible for the expenses personal to the health and well-being of herself and her daughters—insurance, food, health care. At trial, Sekul and Defendant testified about the couple's financial arrangement,

and Defendant gave a line-by-line review of her bank statements. The Court finds

certain evidence especially persuasive to the finding that the Debtor believed that

she was not financially supported by Sekul:

1. The Defendant credibly testified that she paid the majority of the monthly
   food bills "because I had more mouths to feed." Tr. at 152. Defendant's
   reasoning that she was responsible for feeding her dependent children is
   the antithesis of expecting financial support from a partner.

2. The Debtor took substantial cash advances from her credit cards--$1000
   and $3000—in October 2009, parts of which were used to "reimburse"
   Sekul for household expenses. Tr. at 253-57, 365-66.

3. Sekul required the Defendant to pay $264.19 for the cleaning of his
   septic system, having perceived that the Defendant and her daughters
   caused the damage. Tr. at 78. The check for this expense was dated
   February 8, 2010, and posted to the Defendant's checking account on
   February 17, 2010. Tr. at 308. Sekul required the Debtor to pay for
   cleaning the septic despite the credit union having advanced her funds to
   avoid bouncing checks at least seven times before that point, suggesting
   that Debtor was in financial stress at the time. Tr. at 276, 277, 282, 283,
   284. Sekul knew or should have known that the Defendant was in
   financial stress around the time he required her to pay the septic bill,

testifying, "I know in the beginning of 2010 she was starting to, but exactly what month I don't know, but somewhere around the spring of 2010 I know she was starting to have trouble paying bills." Tr. at 50. Additionally, Sekul testified that he accompanied the Defendant to Juran's office before her bankruptcy was filed, and a check Defendant made out to Juran is dated February 23, 2010, indicating that the Defendant had made an appointment with a bankruptcy attorney at about the time Sekul charged her to clean his septic system. While the septic charge itself was a single isolated expense, the timing of this charge indicates that the couple believed that Defendant should pay her own bills, including Sekul's perceived damage to his house.

4.  Defendant testified that it was mandatory in the home that her daughters take drug tests. Tr. at 335. It appears that the condition was imposed by Sekul, because he testified that his own teenage children moved out of his home and back in with their own mother because she had more permissive attitudes toward smoking marijuana and other "typical teenage behavior" that Sekul didn't tolerate. *See* Tr. at 18. Notably, in one instance the Debtor reimbursed Sekul $20 for a drug test kit by adding the $20 to the monthly rent, and Sekul transferred the Defendant $1.65 for the change. *See* Tr. at 312-13, 378. The transfer of the $1.65

persuades the Court that Sekul and Defendant shared a narrow view regarding the financial support of each other; additionally, although the drug tests appear to have been a requirement of Sekul's, the financial burden fell on the Debtor and her daughters. Tr. at 271, 312. Even though the expense for the tests was not great and appears to have arisen as a condition of the household members living together, it illustrates the Defendant's children as having financial liabilities separate from Sekul's responsibilities.

5. Debtor paid the education expenses of her daughters, such as those associated with Advanced Placement courses, SATs, and athletics. Tr. at 207, 289-90, 317-18, 319, 323.

6. Sekul transferred $1100 into the Defendant's account on February 23, 2010, with an annotation, "sooner i pay you the better." Tr. at 377-78; Defendant's Exhibit A. The Defendant testified that she had "overpaid" Sekul for her share of the household expenses, using one of the credit card advances, and this was him returning the overpayment. Tr. at 378. The Court finds that Sekul's begrudging reimbursement of Debtor's "overpayment"—of borrowed money, no less—is inconsistent with a relationship of financial support. If Sekul had truly supported the Defendant financially as Plaintiff argues, then the couple wouldn't have

characterized the transaction as "reimbursement"—to say nothing of the accompanying derisive remark.

7. Debtor paid for her own health, automobile, and disability insurance. Her daughters were covered by her health insurance. Tr. at 152-53 (testifying about the twins' health insurance), 158-61 (testifying about payroll deductions for health insurance), 206-07 (testifying about auto insurance), 207 (disability insurance).

8. Sekul did not testify that he financially supported the Debtor's children during the relevant pre-petition period:

Q        So this supporting of Ms. Fraleigh's daughters strictly happened after the filing?

A        I mean, define support. Would I give them a ride if they needed a ride? Of course.

Tr. at 91. *Accord* Tr. at 242 (Defendant testifying that she did not ask Sekul for additional contribution, during October 2009 to April 2010).

Looming over all this evidence is the fact that Sekul and the Defendant switched off bills in the first place, instead of owning a joint checking account where the household expenses might have been more efficiently tracked and paid. Tr. at 189 (Defendant testifying that Sekul was "on" the loans, but not her savings and checking accounts). While the Court does not go so far as to adopt Defendant's

argument that the only contribution Sekul made was his half of the mortgage
payment, *see* ECF No. 95, the evidence makes it clear that Sekul and Defendant
understood that it was Sekul's house, and the Defendant and her children had to
pay their own way.

With respect to "reckless indifference to the truth," there is no proof that the
Debtor was reckless in omitting Sekul's income and contributions from her
schedules and means test. Schedule I prominently demands disclosure of the
income of a *spouse*, and Debtor and Sekul are unmarried. Further, there is a
complete failure of proof by Plaintiff that the Debtor had any interest in the funds
from Sekul's alleged side businesses that should have been disclosed. Whether he
made significant income from the businesses, and in what amount, is irrelevant, as
Plaintiff has failed to prove that the Debtor had an interest in those funds. As a
third party, the only relevant income of Sekul is the portion he contributed to the
Debtor's support, and, as shown by Debtor's explanation of her bank statements,
Debtor largely supported herself and her dependents on her own income and credit
in the months before the bankruptcy case was commenced.

The Defendant credibly testified that she relied on her attorney in preparing
her schedules and means test. Tr. at 177-78, 201, 216-17, 339. She testified that
she disclosed to her bankruptcy attorney "what I paid and what he paid." Tr. at
217-18. Sekul testified that he accompanied the Defendant to attorney Juran's

office at the time of her bankruptcy consultations, introduced himself to Juran, and

advised Juran that they lived together. Tr. 55. It is clear to the Court that the couple

fully disclosed their relationship and their financial agreement to Defendant's

bankruptcy counsel, and that the Debtor reasonably relied on her attorney to make

the appropriate use of that information in the legal work she had hired him to

perform.

### *(5) The false statement did not materially relate to the bankruptcy case.*

The Court finds that the Defendant did not materially misstate Sekul's

presence and contribution to the Defendant's support, because the contribution was

minimal, even nonexistent. Plaintiff failed to prove that disclosing Sekul as a

member of the Defendant's household would have yielded assets that could be

liquidated for the benefit of the Defendant's estate, or that Sekul increased the

Defendant's income in the relevant pre-petition period by giving her money.

First, Plaintiff failed to produce any evidence at trial of an asset that the

Defendant owned with Sekul that could be liquidated for the benefit of creditors.

Second, the evidence did not persuade the Court that Sekul provided the Defendant

any regular financial support. Sekul and the Defendant both testified that they

shared the cost of Sekul's home, by splitting the mortgage payment—which

included an escrow for property taxes and insurance—50-50. The inequality of this

arrangement is readily apparent. While the payment itself might have been split,

Defendant actually paid more, because she paid half the expenses—mortgage, insurance, property taxes—plus her own lost opportunity of homeownership. She received none of the benefits of homeownership, such as building equity, gaining long-term security, establishing good credit, or taking a tax deduction for the interest on the home loan. Sekul reaped the full benefit of owning the home, while paying just half the cost. With respect to the housing cost, the Defendant actually supported Sekul.

As noted above, Defendant paid several important expenses for herself—health, auto, and disability insurance. Her children contributed to their own car insurance and cell phone costs. Tr. at 266, 267, 287-88. While it may be wise parenting to require teenagers to contribute to their expenses, the fact is the money for these expenses came from the Defendant's children, not Sekul.

The Debtor's cross-examination by her own counsel of her bank statements revealed a series of garden-variety consumer transactions in the months leading up to the filing—dental costs, pet care, food from convenience stores. *See* Tr. at 244-326. The debits were not shown by either side to be anything other than ordinary consumer transactions—financed in substantial part by cash advances from Debtor's own credit cards, filtered through the Debtor's line of credit with her credit union. Sekul credibly testified that he did not make any contributions to clothing or furniture during the relevant pre-petition period. Tr. at 34-35.

The evidence shows that the main sources of Debtor's support in the relevant period before her case was filed were her own wages and credit (cash advances of $4000 on October 14, 2009 and $3000 on October 30, 2009). Tr. at 253-257, 365-366. Substantial deposits into Defendant's checking account that could be credited to Sekul were conspicuously absent. In fact, Debtor credibly testified that the bank statements reflected deposits from the Debtor's daughters to cover their cell phone and car insurance costs. Tr. at 266, 267, 287-88. Plaintiff has not presented proof that the Defendant would have treated Sekul's contributions any different from her daughters.' The Defendant would have been compelled to deposit any cash contributions from Sekul, for the same reasons she deposited the contributions from the children—to avoid overdrafts and pay bills.

In the review of the Debtor's bank statements, there was just one significant deposit, $940 plus $60 cash back at the time of deposit, of which the Debtor could not explain the source. The Debtor testified that she could not remember the source of the $940 deposit, and suggested that it might have come from her parents or her sister. Tr. at 376-77. If the deposit had come from Sekul, then the deposit might support the Plaintiff's argument that Sekul financially supported the Debtor during the relevant period. The Court finds that it would be speculative to assume that the deposit was from Sekul, and inconsistent with the other evidence of the couple's attitude toward their financial relationship. As noted above, the one substantial

deposit that was identified as having come from Sekul—the reimbursement of $1100—was made under protest. Further, the $940 was deposited on February 2, 2010, and the check for the septic cleaning was dated February 8, 2010—less than a week later. Defendant's Exh. A, B. It makes no sense to give someone a gift of $1000 with one hand, and then demand $260 to clean the septic with the other. With respect to the cash advances from the credit cards, the Debtor testified that the $4000 advance was part of a larger advance of $5000—the other $1000 was meant to reimburse Sekul for other house bills. Tr. 253-56. Similarly, the Defendant testified that the $3000 advance from a credit card was used by Sekul to pay household expenses. Tr. 257-58, 365-66. Sekul testified that he "picked up the slack" *AFTER* the Defendant commenced her bankruptcy case, because the Defendant could not use her credit cards to pay bills anymore. Tr. at 90-91 ("Since Ms. Fraleigh had filed for bankruptcy she had no credit cards to use to pay bills which I believe she was doing, and I was picking up the slack for some of the household bills."). Plaintiff has failed to prove that Sekul made such a significant financial contribution to the Defendant's support that the failure to disclose it related materially to the bankruptcy case.

### ***Findings of Fact***

1. The Defendant's household was of four members—Sekul, Defendant, and Defendant's twin daughters.

2.  The Defendant did not know the means test was inaccurate regarding household size.

3.  Defendant and Sekul subjectively intended that they not financially support each other, and instead separately meet their own financial obligations.

4.  The Defendant did not act with fraudulent intent in omitting the information about Sekul, because she assumed that she and Sekul split household expenses equally and that he did not support her or her daughters.

5.  The Defendant relied upon the advice of counsel in preparing the means test and schedules, including his depictions of her household size, income and expenses.

6.  The failure to disclose Sekul as a member of the household was not a material misrepresentation, because Sekul did not make a meaningful financial contribution to the support of the Defendant and her dependents.

## *Conclusions of Law*

1.  The Plaintiff failed to meet his burden of proof with respect to his objection to the Defendant's discharge.

2.  The Defendant should be granted the chapter 7 discharge.

## *Conclusion*

The Plaintiff failed to meet his burden to show that the Debtor made a false oath to the Court with intent to defraud. The evidence presented at trial proves that the Debtor did not receive financial support from Sekul during the relevant pre-petition period. The Court denies the Plaintiff's objection to the Defendant's discharge.

An order will be entered consistent with this ruling.

Dated:   June 12, 2012
Poughkeepsie, New York

/s/ Cecelia G. Morris
Chief United States Bankruptcy Judge